## IN THE UNITED STATES BANKRUPTCY COURT
### EASTERN DISTRICT OF ARKANSAS
### LITTLE ROCK DIVISION

IN RE:  REBA EICHLER, DEBTOR                    CASE NO.: 4:16-bk-14426
                                               CHAPTER 7

FREDERICK S. WETZEL, III                       PLAINTIFF

V.                    AP NO.: 4:17-ap-01089

REBA EICHLER                                   DEFENDANT

### MEMORANDUM OPINION AND ORDER

In this Chapter 7 proceeding, the trustee, Frederick S. Wetzel, III ("Trustee"), filed his *Complaint Objecting to Discharge* ("Complaint") against the debtor, Reba Eichler, pursuant to 11 U.S.C. § 727(a)(3), (4), and (5).  The debtor filed her *Response to Complaint Objecting to Discharge* resulting in a trial on March 14, 2019.  The Trustee appeared personally and by and through his counsel as did the debtor.  At the conclusion of the hearing, the court took this matter under advisement.  For the reasons stated herein, the relief requested in the Complaint is denied. A separate judgment shall reflect this conclusion.

### I. Jurisdiction

This court has jurisdiction over this matter under 28 U.S.C. §§ 1334 and 157.  This is a core proceeding under 28 U.S.C. § 157(b)(2)(J).  The following opinion and order constitute findings of fact and conclusions of law in accordance with Federal Rule of Bankruptcy Procedure 7052.

### II. Findings of Fact

Discharge cases frequently involve debtors understating or failing to disclose assets in an attempt to protect property or disguise inappropriate pre- and post-bankruptcy transactions.  This case, however, involves the anomalous circumstance where the Trustee alleges that the debtor

inappropriately overstated her assets on her schedules.  In his Complaint, the Trustee highlights one entity and one piece of real property—specifically Sun Properties, Inc. ("SPI") and a home located at 114 Belinda Lane.  At trial, the Trustee also developed testimony concerning other pieces of property in support of his contention that the debtor should not receive a discharge.

A.  General

The debtor has experience as both a real estate agent and as a buyer and seller of antiques. Prior to her marriage, she worked as a dental assistant and occasionally ran craft shows.  The debtor married Randy Eichler in 2000, and, thereafter, they enjoyed separate and mutual business interests.  Their relationship included co-mingling assets and expenses and, from the record and testimony, a rather loose adherence to corporate and legal formalities.  When she filed her Chapter 7 Voluntary Petition on August 22, 2016, the debtor was still married to Randy Eichler, whose address she showed as 112 Belinda Lane, which is discussed in more detail below.  (Trustee's Ex. 1, at 45.)  They were, however, going through a divorce that one party initiated in September of 2014.[1]  The divorce was not finalized until November 8, 2018.  According to the debtor, she received basically nothing in the divorce settlement.  Prior to their separation in the Fall of 2014, the debtor felt that she enjoyed good relations with Randy Eichler's family.  Pertinent to this proceeding are Randy Eichler's two sisters, Threasia Rubio and Loetta Gaye Ishmael ("Ishmael").

On her schedules, the debtor acknowledged her pending divorce, referencing Randy Eichler as "Unsecured-For Notice-This is the Debtor's husband and they are going through a divorce and he is being listed to insure proper steps are taken relating to the divorce."  (Trustee's Ex. 1, at 28, 47.)

---

[1] The debtor consistently testified that she filed for divorce, but the case-style reference in her schedules reflected that Randy Eichler may have filed.

The debtor attached to her Statement of Financial Affairs the following general caveat.

Debtor is going through a messy divorce.  The Debtor does not have access to some of her properties as a result and the information contained in this Petition will be updated if documentation or information is discovered along the way that supplements, alters, amends, updates, changes or otherwise differs from her best current recollection.  Every effort has been made to list information as correctly as possible and amendments will be made quickly anytime information is updated.

(Trustee's Ex. 1, at 53.)

It was her belief that she had an interest in all of the properties listed on her schedules, and she wanted to alert the Trustee to that information.  She characterized her listed assets as almost a "wish list" reflecting how ownership should be divided between the debtor and other interested parties.

In her schedules, the debtor listed real property valued at $1,070,100 and personal property valued at $853,674.  (Trustee's Ex. 1, at 1.)  She listed secured debts of $312,826.60 and unsecured claims of $92,241.54.  (Trustee's Ex. 1, at 1.)  Facially, her schedules give the appearance of substantial equity in her estate.

The debtor listed no home mortgage, rental expense, or commensurate real estate taxes or utilities.  The debtor did, however, list "Other real property expenses" of $1675 for a mortgage, $1500 in real estate taxes, and $833.33 in related insurance.  (Trustee's Ex. 1, at 42–43.)

### B.  SPI

The debtor asserted in various narratives on her schedules that she owns SPI.  The debtor, however, did not originally list any non-publicly traded stock or incorporated interests.  (Trustee's Ex. 1, at 9.)  She amended her schedules one month later, on November 2, 2016, to reflect 100% ownership of SPI with an "[u]nknown" value.  (Trustee's Ex. 2, at 7.)  In her Statement of Financial Affairs, she described SPI, as a "[c]orporation owning real property," but described herself as "[a]

3

sole proprietor or self-employed in a trade, profession, or other activity, either full-time or part-time." (Trustee's Ex. 1, at 50.)

SPI filed its Articles of Incorporation on September 18, 1997. (Trustee's Ex. 4.) Incorporators, David and Threasia Rubio, are named respectively as president and secretary. The attached bylaws reflect that share transfers "shall be made only in the stock transfer books of the Corporation by the holder of record thereof, . . . who shall furnish proper evidence of authority to transfer, . . . . The person in whose name shares stand on the books of the Corporation shall be deemed by the Corporation to be the owner thereof for all purposes." (Trustee's Ex. 4.) David and Threasia Rubio each had separate stock certificates dated September 18, 1997, for 150 shares representing 50% ownership each. (Trustee's Ex. 4.)

Threasia Rubio, Randy Eichler's sister, appears as the authorized signator for SPI's checking account opened at First Security Bank on May 28, 1998. (Trustee's Ex. 6.) Equally, the debtor appears as a signator on an identical document executed on March 23, 2000. (Trustee's Ex. 6.)

Two documents, each styled a Certificate of Amendment and dated January 25, 2000, purported to substitute the debtor and Bob York as officers and either the debtor solely or the debtor and Bob York as shareholders of SPI while removing the Rubios. The document that reflects their replacement as officers purports to be signed by the Rubios; the document that replaces the Rubios as shareholders appears to be signed only by the debtor and Bob York. (Trustee's Ex. 4.)

This transfer is possibly disputed by David Rubio. At trial, the Trustee introduced without objection an affidavit signed by David Rubio that was dated May 15, 2015, well before the debtor's bankruptcy. In it, David Rubio states that "paper work exists dated September 18, 1997, I did not

sign, [and] that states that I transferred 150 shares of stock of Sun Properties, Inc. to a Reba Lewis." (Trustee's Ex. 16.)   Two infirmities exist.   First, Mr. Rubio may have mistaken the date of incorporation for the date of transfer.   Second, he did not testify, and the Trustee offered no additional clarification.

An October 24, 2014, a Certificate of Amendment signed solely by Randy Eichler as president purported to remove Bob York as vice president and shareholder, remove the debtor as president, and add Randy Eichler as shareholder, president, and secretary.   (Trustee's Ex. 4.)   A corporate record purports to document a September 10, 2014 shareholder's meeting that self-servingly reflected Threasia Rubio as the sole shareholder present and "after a unanimous vote to do so, determined that the sole director of the Corporation would be:  Threasia Rubio." (Trustee's Ex. 4.)   The debtor testified that she believed this meeting and the documentation occurred at the instance of Threasia Rubio with the assistance of counsel, Buck Gibson.

Subsequently, a Certificate of Amendment reflected an amendment to SPI's articles of incorporation being adopted on December 8, 2014.   This document removed the Rubios as shareholders, "[a]ssign[ed]" the debtor and Bob York as shareholders and officers, and removed Randy Eichler as shareholder, president, and secretary.  (Trustee's Ex. 4.) This document purports to be signed by the debtor as president.  (Trustee's Ex. 4.)   The next corporate document received consists of the minutes of a special meeting of the Board of Directors on December 10, 2014. Threasia Rubio was the only director present and after nominations and votes, made herself president, secretary, and treasurer.  (Trustee's Ex. 4.)   Threasia Rubio substituted herself for the debtor as the agent for service by virtue of a Notice of Change of Registered Agent Information filed in the Secretary of State's office on July 21, 2015.  (Trustee's Ex. 4.)

5

The documents do not fully comport with the witness testimony for either party. Basically, from this record, very little is entirely clear as to the ownership and operations of this umbrella corporation. A witness stated that Randy Eichler was in the courtroom, but he did not testify. Contradiction and confusion filled that vacuum. Some sense of order can be obtained by dividing SPI's history, pertinent to this adversary proceeding, into three stages: (1) the debtor's involvement from 2000 forward; (2) the events around the debtor's divorce commencing in the Fall of 2014; and (3) the debtor's bankruptcy proceeding.

### 1. 2000–2014

As previously stated, incorporators Threasia and David Rubio filed articles of incorporation for SPI in 1997. The debtor testified that when she married Randy Eichler in 2000, she thought he owned SPI—he was president and ran the business. Equally, the debtor believed Randy Eichler conveyed SPI to her in 2000 and that she then began to run the business with him (she had some previous involvement before their marriage). She signed checks, paid taxes, wrangled tax returns, and signed loans for several years. At some unspecified point, the debtor testified that she found out SPI was in Threasia Rubio's name and that Randy Eichler wanted to transfer it to the debtor. Apparently, Randy Eichler used his sister's and then the debtor's names to operate the business because, as the debtor testified, he had a large IRS debt. The debtor also understood that Threasia Rubio wanted out and was "off having babies." This version is consistent with a lack of evidence that Threasia Rubio, other than signing some checks, or David Rubio actively participated in any management or business activities of SPI from 2000 to Fall of 2014.

Threasia Rubio testified that her mother wanted her to be the owner with the expectation that Randy Eichler would operate the business. According to Threasia Rubio, her parents put other assets in her name as well. Threasia Rubio acknowledged on cross-examination that when she and

David Rubio divorced in 2010, he transferred his stock in SPI to her but that she did not list any ownership in her divorce decree; she considered it "family property." (Debtor's Ex. 2.)

The debtor disclaimed much knowledge about the two Certificates of Amendment executed in early 2000 that had the effect of replacing the Rubios and substituting the debtor and possibly Bob York as shareholders/officers. She believed that they were consistent with Randy Eichler wanting her to replace his sister, but she did not know if either or both of the Rubios signed the documents. She did not recall any board meetings authorizing these documents.

### 2. Fall of 2014

The record in this proceeding is bereft of evidence of anyone other than the debtor operating SPI on a day-to-day basis between 2000 and 2014. Equally, it does not appear that the Rubios showed any keen interest or engaged in any inquiry about SPI's activities or ownership during this period. That all changed in September of 2014 when the debtor or Randy Eichler filed for divorce. The debtor testified that Threasia Rubio got back involved in SPI around that time.

In her view, Threasia Rubio believed that her brother ran the day-to-day operations and that only in 2014, when the debtor left Randy Eichler, did she investigate and first learn of the debtor's ownership of SPI. She also discovered that the checking account was empty. She testified that she eventually owned 100% of SPI and did not sign any of the documents transferring any interest to the debtor. When she learned about the transfer of interest in 2014, she hired a lawyer and held a meeting in September of 2014 to declare herself director. She also testified that she was the only shareholder at that time and confirmed the assistance of an attorney, Buck Gibson.

Randy Eichler apparently took similar steps in the same time frame. The debtor testified that she had no knowledge of the October 2014 Certificate of Amendment, signed only by Randy Eichler as president, purporting to remove Bob York as vice president and shareholder, remove

the debtor as president, and add Randy Eichler as shareholder, president, and secretary. (Trustee's Ex. 4.) When she found out in December of 2014, the debtor assumed it was because of the divorce and promptly went to the Secretary of State's office and put SPI back in her name. (Trustee's Ex. 4, Certificate of Amendment dated December 8, 2014, filed the same date.)

The debtor testified that she stopped running SPI in 2015 when they ceased giving her the documents or any rent proceeds. She had no salary.

In July of 2016, Threasia Rubio filed a complaint with the Arkansas Real Estate Commission alleging, inter alia, that the debtor had "taken my [SPI] company," substituted herself for the Rubios, and over a period of time had taken a significant amount of money. (Trustee's Ex. 13.) By letter to Threasia Rubio dated September 26, 2017, the State of Arkansas Real Estate Commission dismissed her complaint after determining that she "did not produce sufficient evidence which could be used to establish the fact that the [debtor] intentionally violated the Arkansas Real Estate License Law or Regulations issued by this Commission." (Debtor's Ex. 1.)

### 3. Debtor's Bankruptcy in 2016

The Eichler family's divestment of the debtor's interest in SPI, gained properly or improperly in 2000 and perhaps again in 2014, commenced in 2014. The debtor concluded her efforts to run SPI sometime in 2015, well before her bankruptcy filing in August of 2016 and before her divorce finalized in November of 2018. The debtor testified that when she filed bankruptcy in August of 2016, she was trying to pay various mortgages without any commensurate income. The debtor listed Threasia Rubio in her schedules as an unsecured creditor for notice purposes.

After her filing, the Trustee, as part of his duties, attempted to determine the debtor's interest in SPI and its value to the estate. He testified that he determined that SPI's stock was

restricted with respect to transfer. That is, transfer could occur only on the books of the corporation. After researching the issue, he determined that it would be appropriate to relinquish any interest of the estate in SPI.

As she sat on the stand at trial, the debtor testified that she did not know who owned SPI. The debtor did, however, testify that it was her belief that she owned all of SPI's assets. The SPI related real property that the debtor listed in her schedules is described below:

### a.  309 Campbell Dr.

The debtor scheduled an "Equitable Interest" in this single-family home valued at $181,950, accompanied by the following notation:

> Owned in the name of "Sun Properties, Inc." (an Arkansas Corporation) but debtor is personally liable on the debt and owns the company and thus the property is listed for disclosure.

(Trustee's Ex. 1, at 4.)  Her Schedule D reflected a mortgage debt of $52,000 to First Security Bank. (Trustee's Ex. 1, at 16.)  In November of 2016, the debtor amended her schedules to reflect this property as "Commercial Property" instead of a single-family home. (Trustee's Ex. 2, at 2.)

### b.  217 Mayfield Rd.

The debtor scheduled an "Equitable Interest" in this single-family home and acreage valued at $102,150, accompanied by the following notation:

> 100 acres of land and home. Owned in the name of "Sun Properties, Inc." (an Arkansas Corporation) but debtor is personally liable on the debt and owns the company and thus the property is listed for disclosure.

(Trustee's Ex. 1, at 5.)  The debtor's schedules, introduced by the Trustee, reflected no equity in this property. Schedule D reflected a value of $102,150 against a mortgage claim of $126,007.69 benefiting AgHeritage Farm Credit Service. (Trustee's Ex. 1, at 15.)  The debtor's Schedule D had the same disclaimer notation. (Trustee's Ex. 1, at 15.)  On November 2, 2016, the debtor

amended her ownership interest and valuation up to $800,000.  (Trustee's Ex. 2, at 3.)  The debtor testified that she felt that was what the land was worth.

The debtor also listed twelve cows at this location valued at $24,000.  (Trustee's Ex. 1, at 11.)  The debtor testified that they were owned by her and Randy Eichler, but she had not seen them for approximately two years before her bankruptcy, or 2014.  Threasia Rubio testified that she had given six or seven cows to the debtor.  Ismael confirmed that the debtor and Randy Eichler had "several" cows.

### c.  307 Dorman Rd.

The debtor scheduled an "Equitable Interest" in this mobile home and land valued at $58,000 with the following notation:

> Dbl wide trailer and 5 acres of land.  Owned in the name of "Sun Properties, Inc."
> (an Arkansas Corporation) but debtor is personally liable on the debt and owns the
> company and thus the property is listed for disclosure.

(Trustee's Ex. 1, at 5.)  The debtor later, on November 2, 2016, amended her valuation and ownership interest to $125,000.  (Trustee's Ex. 2, at 3.)  She based this increased valuation on what they paid for the property.  The debtor testified that her daughter lived there for approximately one year without paying rent.

### d.  3903 AR Hwy 367 S

The debtor listed an "Equitable Interest" in this multiunit building, later in November of 2016 amended to "Commercial Property," valued at $272,350 with the following notation:

> Commercial property with 2 buildings and 3 acres of land.  Owned in the name of
> "Sun Properties, Inc." (an Arkansas Corporation) but debtor is personally liable on
> the debt and owns the company and thus the property is listed for disclosure.

(Trustee's Ex. 1, at 6; Trustee's Ex. 2, at 4.)

10

Essentially, this concludes the debtor's representations of any actual value in SPI.  It appears SPI owned property and related personalty, all of which the debtor disclosed with caveats about her divorce and that she owned the company, not the property.

### C.  114 Belinda Lane

This specific piece of property forms with SPI an equal basis for the Trustee's request for denial of the debtor's discharge.  In her schedules, the debtor listed this as a single-family home, owned solely by the debtor in fee simple and valued at $275,600.  (Trustee's Ex. 1, at 4.)  She also noted:

> There is a large warehouse on the 1.84 acres attached to this property that was previously used as an antique store.  Currently the debtors mother lives in the home. No Liens[.]

(Trustee's Ex. 1, at 4.)  The debtor, on her Schedule C, exempted $15,675 in this property pursuant to 11 U.S.C. § 522(d)(1).  (Trustee's Ex. 1, at 13.)  On her November 2, 2016 amended schedules, she exempted this property in the amount of $3850 under 11 U.S.C. § 522(d)(5).  (Trustee's Ex. 2, at 11.)

Also, the debtor noted in her schedules that Norma Hilliard (her mother) resided at this address as an unsecured creditor for a $15,000 "Personal Loan."  (Trustee's Ex. 1, at 28.)  Though apparently not her residence at the time she filed bankruptcy, the debtor did live on these premises within the three years prior to her bankruptcy.  (Trustee's Ex. 1, at 45.)

In his Complaint, the Trustee alleges that the debtor claimed ownership in this property when she was not the legal owner, having obtained any interest through forged deeds. (Complaint, Aug. 15, 2017, ECF No. 1, at ¶ 24.)  Rather, the Trustee posits that Ishmael, as trustee for the L.E.T. Group, is the record titleholder pursuant to a Warranty Deed executed on August 21, 1997,

from her mother, Louise Eichler, and recorded on August 25, 1997.  (Comp. at ¶¶ 13–15; Trustee's Exs. 1, 15.)  Louise Eichler is Randy Eichler, Threasia Rubio, and Ishmael's mother.

The debtor and her mother, Norma Jean Hilliard, ostensibly obtained title to this property by a Warranty Deed dated April 15, 2002, from Ishmael as trustee for the L.E.T. Group, which deed was later subject to a correction deed.  (Trustee's Ex. 15, at 16–17.)  The debtor also testified that when Randy Eichler's mother died, Randy Eichler obtained the deeds from his siblings and caused the property to be deeded to the debtor and her mother.  Thereafter, the debtor's mother, Norma Jean Hilliard, conveyed her interest to the debtor by a Quit Claim Deed dated July 28, 2005, and recorded on August 8, 2005.  (Trustee's Ex. 15, at 19–20.)  Five minutes later on the same day, the debtor and Randy Eichler purportedly conveyed the same property by Quitclaim Deed to SPI.  (Trustee's Ex. 15, at 21–22.)  Seven years later, by a Quitclaim Deed dated February 7, 2012, the debtor, as president of SPI, deeded the property back to herself.  This deed was recorded on February 16, 2012.  (Trustee's Ex. 15, at 23.)

The debtor scheduled Ishmael, trustee for the L.E.T. Group, as a creditor based on a "Civil Suit Complaint."  (Trustee's Ex. 1, at 27.)  The then pending lawsuit in the Circuit Court of White County, Arkansas reflects the debtor and her mother as defendants.  (Trustee's Ex. 1, at 47.)

Congruently, after the debtor filed her Chapter 7 Voluntary Petition, Ishmael filed an adversary proceeding against the debtor.  The only pleading from Ishmael's adversary proceeding of record in this action is a motion to abstain filed by Ishmael.  (Trustee's Ex. 15.)  The motion recites that on May 8, 2015, Ishmael individually and as trustee for the L.E.T. Group, filed a complaint against the debtor in the Circuit Court of White County seeking to set aside allegedly fraudulent deeds, to evict the debtor's mother, and for damages.  (Trustee's Ex. 15.)  Attached to the motion to abstain is a motion for summary judgment filed in the state court action that includes

12

excerpts from the debtor's deposition in the state court action. In the deposition excerpt, the debtor essentially stated that her husband, Randy Eichler, gave the property to the debtor and her mother for the debtor's labor in helping her husband. (Trustee's Ex. 15, at 11–12, 16.) Further, the debtor denied participating in the preparation or execution of the deed transferring the property to the debtor in 2002. (Trustee's Ex. 15, at 11–12, 15–16.) Also attached to the motion is an affidavit of Randy Eichler wherein, inter alia, he states that he did not know anything about the deed transaction and never agreed to transfer the property to his wife or her mother. (Trustee's Ex. 15, at Ex. E.) As noted above, Randy Eichler did not take the stand and his comments in this regard, though part of the record, were not subject to cross-examination or elaboration. The same applies to an affidavit by Brenda Petty, a forensic document examiner, who did not testify at trial but suggested in her affidavit that Ishmael did not sign the deeds in question. (Trustee's Ex. 15, at Ex. F.) The Trustee did not introduce any other pleadings from Ishmael's adversary proceeding.

At trial in this proceeding, the debtor stated that after Randy Eichler's mother died he wanted the property to be put in the debtor and her mother's name. In her view, Randy Eichler owned the property but put it in the L.E.T. Trust, presumably through his mother. After his mother died, the debtor's mother lived there. The debtor also testified that the Quitclaim Deed from SPI to her in February of 2012 came at the direction of her accountants as the loan had been paid off and because, as she explained it, SPI was a subchapter C corporation. The debtor testified that Ishmael only made demand for the return of the property after the divorce was filed.

Ishmael testified that she started asking for the home in 2014 and got an attorney. Apparently, Ishmael considered the house hers, and, after her husband died in 2012, she came "back" and told the debtor and her mother it was time to go. Threasia Rubio and Randy Eichler had been paying the taxes. According to Ishmael, Randy Eichler gave the debtor's mother six

13

months to get money and a job, but Ms. Hilliard stayed for approximately nine years. Clearly, this deadline would predate the 2012/2014 time frame and presumably related back to an earlier period. Ishmael testified that she is currently living at 114 Belinda Lane. How Ishmael regained possession of the property is not entirely clear on this record. Ishmael testified that she filed a lawsuit and that around Thanksgiving of 2017 got some type of court order, and the debtor's mother moved out.

In July of 2016, Ishmael filed a complaint with the Arkansas Real Estate Commission alleging that the debtor had fraudulently deeded this property to herself and her mother by forging Ishmael's name to the Warranty Deed dated April 15, 2002, filed of record April 26, 2002, and three years later supplemented by a second deed to correct an error made in the original. (Trustee's Ex. 14.) By letter to Ishmael dated September 26, 2017, the State of Arkansas Real Estate Commission dismissed her complaint after determining that she "did not produce sufficient evidence which could be used to establish the fact that the [debtor] intentionally violated the Arkansas Real Estate License Law or Regulations issued by this Commission." (Debtor's Ex. 1.)

### D. 112 Belinda Lane

The Trustee's Complaint focused exclusively on SPI and 114 Belinda Lane. At trial, however, the Trustee also referenced other properties, presumably in an attempt to demonstrate other inconsistencies or overstatements in the debtor's schedules. In her schedules, the debtor listed this single-family home on 2.36 acres as owned solely by the debtor in fee simple and valued at $180,050. (Trustee's Ex. 1, at 3.) The debtor, on her Schedule C, exempted $8000 in this property pursuant to 11 U.S.C. § 522(d)(1). (Trustee's Ex. 1, at 13.) Her Schedule D reflected a mortgage debt of $119,378 to Bank of America. (Trustee's Ex. 1, at 15.)

Though apparently not her residence at the time she filed bankruptcy, the debtor did live on these premises within the three years prior to bankruptcy.  (Trustee's Ex. 1, at 45.)  The debtor testified she lived there from July 2000 to September 2013.  She and Randy Eichler's 2015 Personal Property Assessment in White County, Arkansas, reflected this address.  (Trustee's Ex. 3.)  In her Statement of Intention, the debtor proposed to "[s]urrender the property" to Bank of America.  (Trustee's Ex. 1, at 54.)

The debtor filed her original schedules on September 1, 2016, but quickly amended them on November 2, 2016.  (Trustee's Ex. 2.)  In her amendment, she reduced the value of this property to $120,000 because of disrepair.  (Trustee's Ex. 2, at 1.)  In the same amendment, she reduced her claimed exemption on this property to $622.  (Trustee's Ex. 2, at 11.)

### E.  Collectibles of Value/Ole South

Under this category in her schedules, the debtor listed $500,000 in collectibles or antiques, with the following notation:

> Warehouse full of antiques that she has no access to for the past 2.5 years (used to own antique store with husband. Debtor is unaware if any of it is still there)

(Trustee's Ex. 1, at 7.)  Presumably, these antiques relate to both the property at 114 Belinda Lane and an entity called Ole South Antiques and Collectibles, Inc. ("Ole South").[2]  Specifically, in her Schedule A, the debtor referenced the 114 Belinda Lane property and stated "[t]here is a large warehouse on the 1.84 acres attached to this property that was previously used as an antique store."  (Trustee's Ex. 1, at 4.)

Threasia Rubio signed the Ole South Articles of Incorporation on May 22, 1999, and filed them shortly thereafter with the Arkansas Secretary of State's office.  She listed herself as both the

---

[2]  An unexplained reference exists in the debtor's 2006 tax return that shows business losses from an Antique Booth at 112 Belinda Lane.  (Trustee's Ex. 7.)

registered agent and incorporator, stating that the purpose was to sell antiques and collectibles. Thereafter, the debtor as president filed with the Secretary of State's office a Certificate of Amendment reciting that a June 1999 amendment had been adopted to substitute the debtor as agent for service and to remove Threasia and David Rubio as corporate shareholders.  (Trustee's Ex. 5.)  The filing date is not clear though the debtor testified that it was filed on May 11, 2000. This amendment suggests that there are 300 shares of stock with two voting shareholders, despite the fact that the original Articles of Incorporation reference 1000 shares of stock. (Trustee's Ex. 5.)

Ole South had a checking account at First Security Bank as evidenced by a signature card that incongruously suggests that it is a sole proprietorship with Threasia Rubio listed as "Owner" but with the debtor added as an authorized signator on September 29, 1999.  (Trustee's Ex. 6.)

Interestingly, the Trustee's Exhibit 5, which is a compendium of documents that represent "[a]ll Corporate records on file for [Ole South]," is dated December 8, 2014.  Apparently, someone at that time made an effort to fully investigate Ole South's rather sparse corporate records. Presumably, that would not be the Trustee as he was not appointed until 2016, but that date does correspond to the debtor's divorce and the renewed Eichler family interest in Randy Eichler related assets.

Threasia Rubio testified that she had always been the sole shareholder of Ole South and that the business closed in 2007 as antique malls were not making much money at that time.  She recognized that there was a warehouse of antiques listed in the debtor's schedule with an estimated value of $500,000.  Threasia Rubio indicated that Ole South did not have that much inventory but that some was left in the storage building.  The debtor agreed that she disclosed a closed business;

she also was not sure about the remaining inventory.  She used the $500,000 figure based on her experience with the business but had not seen the inventory since September of 2014.

### F.  Clothes/Jewelry

The debtor in her schedules listed $3000 in clothes, with a caveat: "[c]lothing (she had to start all over and still has clothing and wearing apparal in home worth $20k if its there)." (Trustee's Ex. 1, at 8.)  The debtor, on her Schedule C, exempted the entire $3000 pursuant to 11 U.S.C. § 522(d)(3).  (Trustee's Ex. 1, at 14.)

The debtor made a similar entry in the Jewelry category, countering a $2000 entry with a comment: "[j]ewelry (she had to leave approx $5k in jewelry behind)."  (Trustee's Ex. 1, at 8.) The debtor, on her Schedule C, exempted $1600 in this property pursuant to 11 U.S.C. § 522(d)(4). (Trustee's Ex. 1, at 14.)

### G.  John Deere Tractor

The debtor listed in her schedules a 1996 John Deere tractor with attachments owned solely by her and valued at $10,000.  (Trustee's Ex. 1, at 7.)

### H.  Household Goods and Furnishings

The debtor in her schedules divided this category into two parts.  First, she referenced $6000 in what she characterized as "[h]ousehold [g]oods- Specifically for use of the Debtor in her own residence, not remaining business inventory."  (Trustee's Ex. 1, at 7.)  Second, she listed $250,000 in "[h]ousehold [g]oods, furniture and other things located at 112 Belinda Lane (Debtor's husband has denied her access to this location but the property is believed to still be there and this to be an estimate of valuation)."  (Trustee's Ex. 1, at 7.)  The debtor dropped the $250,000 valuation in her November 2, 2016 amended schedules. At trial, the debtor testified that she did

not have any explanation for that change.  She did indicate that a lot of it was at the antique store when the business closed in 2012, and that Randy Eichler thereafter denied her access.

The debtor, on her Schedule C, exempted the entire remaining $6000 in property pursuant to 11 U.S.C. § 522(d)(3).  (Trustee's Ex. 1, at 14; Trustee's Ex. 2, at 12.)

### I.  Trustee's Efforts

The Trustee testified concerning his efforts to liquidate the estate.  In December of 2016, he asked another trustee to conduct the initial first meeting of creditors, which was continued to a second time.  The Trustee testified that collectively "we" asked the standard questions about her schedules being true and correct and prepared with assistance of counsel.  The other trustee, who did not testify, asked about day-to-day operations and tax returns, with the debtor saying that she did both.  The Trustee then declared this an asset case based on the supposed value of SPI and potentially some of the listed real and personal property.

The Trustee testified that he finally "resolved the title issues" on 114 Belinda Lane in late 2017 or 2018.  He recalled that both Threasia Rubio and Ishmael had pending state court actions. He addressed the title issues regarding 114 Belinda Lane in an adversary proceeding filed by Ishmael against the Trustee and the debtor by filing an avoidance counterclaim.  He resolved Ishmael's adversary proceeding by settlement wherein the estate relinquished any interest it might assert through the bankruptcy, and Ishmael paid money into the estate for any interest it had.  The Trustee studied the motion to abstain and the underlying documents which helped him formulate his position and presumably led to the settlement.  (Trustee's Ex. 15.)  He offered no testimony regarding the amount paid to the estate.

The same scenario also played out with respect to Threasia Rubio and SPI.  The Trustee filed the same type of counterclaim as in the Ishmael proceeding.  He reviewed the stock

certificates and corporate records.   He ascertained the restrictions on transfer of the stock certificates (only on the books of the corporation), which he considered usual and typical for pre-printed certificates.   (Trustee's Ex. 4.)   Thus, after his investigation, a review of the documents, positions of the parties, and case law, he relinquished any estate interest in SPI.   He considered that an asset acquired by fraud would not be an asset of the estate.   The pleadings in that adversary proceeding are not part of the record in this case.

The Trustee considered the information in the schedules as material to his process of determining if this was an asset case.   On cross-examination, he conceded that the debtor had otherwise cooperated.   Further, the Trustee recognized that there had been no findings of fraud against the debtor but the possibility that assets might have been improperly acquired formed part of his decision making calculus.

### III.  Analysis

The Trustee seeks to deny the debtor's discharge on three independent bases:  11 U.S.C. § 727(a)(4), (3), and (5).

### A.  11 U.S.C. § 727(a)(4)

Based on the evidence presented at trial, the Trustee principally seeks to deny the debtor's discharge pursuant to 11 U.S.C. § 727(a)(4).   This provision authorizes the court "to deny a debtor's discharge if [s]he intentionally made a misrepresentation in connection with h[er] bankruptcy case[.]"  *Floret, LLC v. Sendecky* (*In re Sendecky*), 283 B.R. 760, 764 (B.A.P. 8th Cir. 2002).

(a)  The court shall grant the debtor a discharge, unless—
    (4) the debtor knowingly and fraudulently, in or in connection with the case—
        (A)  made a false oath or account;
        (B)  presented or used a false claim;

19

(C) gave, offered, received, or attempted to obtain money, property, or advantage, or a promise of money, property, or advantage, for acting or forbearing to act; or

(D) withheld from an officer of the estate entitled to possession under this title, any recorded information, including books, documents, records, and papers, relating to the debtor's property or financial affairs.

11 U.S.C. § 727(a)(4) (2019).

Facially, and as discussed in more detail below, the inquiry is whether the debtor made a false oath or account on her schedules or if she withheld recorded information from the Trustee relating to her property or financial affairs. Specifically, with respect to SPI, the Trustee alleges that the debtor was not a stockholder. If true, that presumably would be contrary to the assertions of ownership set forth in her schedules. (Comp., at ¶¶ 3–9, 11–12.) In the Complaint, however, the Trustee expands the focus of any inquiry beyond the statute, alleging

10. [The debtor] did transact business on behalf of [SPI] ignoring any duties as a fiduciary or officer of [SPI]. She used property of [SPI] for her personal benefit. Specifically, she obtained company credit cards used to gamble at casinos. She further used said credit cards for her personal benefit. Further:

a. Debtor executed deeds on behalf of the [SPI] without having proper authorization by the Board of Directors;

b. Opened bank accounts on behalf of [SPI] without having proper authorization by the Board of Directors;

c. Obtained loans and credit cards accounts on behalf of [SPI] without proper authorization by the Board of Directors;

d. Pledged property of [SPI] without proper authorization by the Board of Directors;

e. Withdr[ew] and deposited funds into various accounts for her personal use; and

f. Ignored any fiduciary duties owed to [SPI].

(Comp., at ¶10.) All of these alleged acts occurred well before the debtor's bankruptcy filing. Some, if true, may form the basis of private causes of action by parties other than the Trustee; equally, the Trustee has an interest in the fundamental question of the debtor's interest in SPI and

whether she made any intentional misrepresentation in this bankruptcy in that regard. That distinction is material and relevant to this court's analysis and cannot be ignored.

Concerning 114 Belinda Lane, the allegations in the Complaint are bit more straightforward—reciting that the debtor listed ownership in property that the Trustee alleges the debtor obtained prepetition through forged deeds. (Compl., at ¶ 13–24.) Yet again, the series of transactions whereby the debtor ostensibly obtained the property by alleged fraudulent means concluded in 2012, well before the debtor's bankruptcy.

Internecine family disputes involving prepetition claims that could result in dischargeability causes of action, each more properly held by SPI, its putative shareholders, or various in-laws, should not unduly taint an analysis of whether this debtor in her schedules or at her first meeting made a false oath or account or withheld information sufficient to deny her discharge. The court's record compels the conclusion that this debtor did not make intentional misrepresentations concerning her bankruptcy case, specifically with respect to her schedules. Other than simply affirming her schedules, the record contains no compelling testimony or evidence to suggest that the debtor made any material misrepresentations at her first meeting of creditors.

Although not specific, presumably the Trustee in his Complaint is requesting relief pursuant to 11 U.S.C. § 727(a)(4)(A). "To deny a discharge under 11 U.S.C. § 727(a)(4)(A), the [Trustee] must establish the following elements: 1. the debtor made the statement under oath; 2. the statement was false; 3. the statement was made with fraudulent intent; 4. the debtor knew the statement was false; and 5. the statement related materially to the debtor's bankruptcy." *Helena Chemical Co. v. Richmond* (*In re Richmond*), 429 B.R. 263, 307 (Bankr. E.D. Ark. 2010) (citing *Smith v. Cooper* (*In re Cooper*), 399 B.R. 637, 646 (Bankr. W.D. Ark. 2009)). "For [] a false oath

or account to bar a discharge, the false statement must be both material and made with intent." *Korte v. U.S. Internal Revenue Serv.*, 262 B.R. 464, 474 (B.A.P. 8th Cir. 2001) (citations omitted). The materiality standard is a very low bar and can be met if the statement "bears a relationship to the bankrupt's business transactions or estate, or concerns the discovery of assets, business dealings, or the existence and disposition of h[er] property." *Id.* (citation omitted). The debtor's intent "'can be established by circumstantial evidence' and 'statements made with reckless indifference to the truth are regarded as intentionally false.'" *Id.* (citations omitted). The burden is on the Trustee to prove the debtor's intent. *Ellsworth v. Bauder* (*In re Bauder*), 333 B.R. 828, 832 (B.A.P. 8th Cir. 2005).

The purpose behind section 727(a)(4)(A) is to "promote[] truth-telling in the statements and schedules so that creditors and trustees will not have to resort to independent investigation and fact-finding." *Daniel v. Boyd* (*In re Boyd*), 347 B.R. 349, 355 (Bankr. W.D. Ark. 2006). "The disclosure requirement has implications beyond the administration of each individual bankruptcy case because '[t]he failure to comply with the requirements of disclosure and veracity necessarily affects the creditors, the application of the Bankruptcy Code, and the public's respect for the bankruptcy system as well as the judicial system as a whole.'" *Fowler v. Weathers* (*In re Weathers*), Ch. 7 Case No. 5:09-bk-73659, Adv. No. 5:09-ap-07203, slip op. at 11 (W.D. Ark. July 21, 2011) (citation omitted). Ultimately, the goal is to ensure "full and complete disclosure of any and all apparent interests of any kind." *Korte*, 262 B.R. at 474 (citation omitted).

Context is essential and dispositive in reviewing the debtor's schedules—specifically with respect to SPI and 114 Belinda Lane and generally with respect to other assets. The disclosures in the schedules must be juxtaposed against the debtor's marriage, long use and operation of those

assets, the decline of her marriage in 2014, her 2016 bankruptcy filing, and a divorce that was not finalized until 2018.  It is in light of those circumstances that the schedules are judged.

The debtor married Randy Eichler in 2000, and they engaged in separate and co-mingled business activities.  Apparently, Randy Eichler's parents had routinely put property in their children's names.  Randy Eichler engaged in transactions in his sister and wife's names because, as the debtor testified, he had significant IRS problems.  From 2000 to their separation and divorce action in 2014, the debtor felt she had reasonably good relations with the Eichler family.  The record is bereft of any real efforts by the Eichler family, Threasia Rubio or Ishmael, to operate, investigate, or divest the debtor of any of her accumulated property interests in all those years.

That all changed when either the debtor or Randy Eichler commenced divorce proceedings in September of 2014.  Contemporaneous with the decline of her marriage, Randy Eichler and both of his sisters began to, in effect, investigate the very business activities that Randy Eichler had long conducted with his wife, the debtor.  Their sudden concern did not seem to relate to what Randy Eichler had been doing all those years.  Rather they, with Randy Eichler's participation, began disputing any interests she might have had in Randy Eichler's businesses, all of which had been previously unquestioned for years.

The debtor filed for Chapter 7 bankruptcy on August 22, 2016.  At that time, her divorce was not yet finalized and did not conclude until November of 2018, well after her bankruptcy filing.  The debtor testified that she and Randy Eichler had co-mingled their assets and expenses during their marriage, that she believed she had an interest in all the properties listed on her schedules, and that she wished to alert the Trustee to that fact.  She also characterized the scheduled assets as a "wish" list of what she was asking for and might receive in her divorce.  She

acknowledged the ongoing divorce by listing Randy Eichler for notice purposes. With respect to her property listings, she specifically caveated:

> Debtor is going through a messy divorce. The Debtor does not have access to some of her properties as a result and the information contained in this Petition will be updated if documentation or information is discovered along the way that supplements, alters, amends, updates, changes or otherwise differs from her best current recollection. Every effort has been made to list information as correctly as possible and amendments will be made quickly anytime information is updated.

(Trustee's Ex. 1, at 53.)

The debtor listed on her schedules what she believed to be her ownership interests in SPI and 114 Belinda Lane. No nefarious benefit accrued; her ultimate interests in these assets had not yet been settled in her divorce, in litigation then pending, or litigation subsequently filed.

### 1. SPI

As initially filed, the debtor did not list any non-publicly traded stock or incorporated interest. (Trustee's Ex. 1, at 9.) She did, however, make frequent references to SPI as follows:

> [PROPERTY DESCRIPTION] Owned in the name of "Sun Properties, Inc." (an Arkansas Corporation) but debtor is personally liable on the debt and owns the company and thus the property is listed for disclosure.

(Trustee's Ex. 1.) Approximately one month later, in November of 2016, she amended her schedules to reflect 100% ownership of SPI with an "[u]nknown" value. (Trustee's Ex. 2, at 7.) In her Statement of Financial Affairs, she showed her interest in SPI, a "[c]orporation owning real property," as "[a] sole proprietor or self-employed in a trade, profession, or other activity, either full-time or part-time." (Trustee's Ex. 1, at 50.) In her schedules, the debtor also listed Threasia Rubio as an unsecured creditor for notice purposes; thus, making no effort to hide her bankruptcy from her then current in-law.

The "Equitable Interest" notation on each piece of SPI property invited inquiry and gave notice of less than full ownership. Rather, the debtor's interest was in a corporation that owned

24

real property.  The debtor actually believed she owned SPI and acted accordingly in both listing it and in asserting her ownership.  A factual and legal dispute may have loomed, but she had a basis for her belief.

While David and Threasia Rubio were the original incorporators in 1997, the debtor commenced her active involvement, both through corporate filings and day-to-day operations, in early 2000. Nothing really changed until October of 2014 when Randy Eichler signed and filed a Certificate of Amendment removing the debtor and inserting himself as shareholder, president, and secretary of SPI.  (Trustee's Ex. 4.) That timing is consistent with the divorce filing and Threasia Rubio, who, based on the court's record, had almost no involvement in SPI in the prior fourteen-year period, making inquiry and reasserting herself into corporate operations.  Threasia Rubio acknowledged that she only investigated SPI's ownership when the debtor left Randy Eichler in 2014.  The debtor testified that from 2000 to 2014 she thought Randy Eichler was the president and a shareholder and that he conveyed SPI to her in 2000 when she began to run the day-to-day operations.  She also acknowledged that at some point she found out that SPI was in Threasia Rubio's name and that Randy Eichler wanted to transfer it to the debtor, having used his sister's and subsequently the debtor's names to operate the business because of his IRS issues. Threasia Rubio did not even list any stock ownership in SPI in her 2010 divorce because she considered it "family property."  Consistent with the debtor's belief, when the debtor found out that Randy Eichler had transferred the corporation back to himself in October of 2014, she promptly, in December of 2014, went to the Secretary of State's office and put SPI back in her name.  She only stopped running SPI in 2015 when the Eichler family ceased giving her documents or rent proceeds.  Nevertheless, she believed then and when she filed bankruptcy in 2016 that she was SPI's true and rightful owner.

25

The record does not clearly reflect when that belief was no longer tenable except that it was clearly post-petition.  Certainly, the references to the messy divorce and the disjunctive ownership of real property versus the corporation would put interested parties on notice to inquire about the circumstances.  The Trustee testified that he filed a counterclaim in an adversary proceeding initiated by Threasia Rubio.  Thereafter, he reviewed the stock certificates and corporate books and concluded that the boilerplate restrictions on stock transfers applied and that the debtor did not validly hold ownership of the corporation.  He, accordingly, relinquished the debtor's interest in SPI.  Although he acknowledged that an asset acquired by fraud would not be property of the estate, he recognized that no finding of fraud had occurred.   Quite simply, the debtor had a valid basis to assert ownership in her schedules—she made appropriate caveats and noticed her opponents.  Although the Trustee, as her successor, concluded otherwise, she made no intentional false oath or account with respect to SPI.

## 2.  114 Belinda Lane

In his Complaint, the Trustee noted that the debtor claimed ownership of 114 Belinda Lane but suggested that her interest was obtained by forged deeds.  Yet, all the factual predicates to this cause of action concluded no later than February of 2012, over four years before the debtor's August 2016 bankruptcy filing.  Again, the debtor absolutely believed that she owned the property.

Equally, the debtor knew that another unresolved factual and legal dispute loomed. (Trustee Ex. 1, at 4.)  The debtor made certain to list Ishmael, trustee for the L.E.T. Group, as a creditor based on a "Civil Suit Complaint."  (Trustee's Ex. 1, at 27.)  The then pending lawsuit in the Circuit Court of White County, Arkansas, named the debtor and her mother, Norma Jean Hillard, as defendants.  (Trustee's Ex. 1, at 47.)  Ishmael sought to dispossess the debtor and/or her mother of the property.  (Trustee's Ex. 15, at 1–3.)  In that same capacity, Ishmael filed an

26

adversary proceeding in the debtor's bankruptcy to permit her to address and resolve in state court the pending dispute with the debtor and her mother. (Trustee's Ex. 15.) This filing occurred post-petition while the debtor's mother still resided there, and the debtor still asserted ownership. (Trustee's Ex. 1, at 28.) Based on the deed history and the debtor's testimony, she believed that she enjoyed an ownership interest as early as 2002 with complete ownership in February of 2012. She testified that when Randy Eichler's mother died he obtained the deeds from his siblings and caused the property to be deeded to the debtor and her mother. The debtor also testified that she transferred the property from SPI to herself in 2012 on her accountant's advice. The debtor testified that Ishmael only made demand for the property after the divorce was filed, a consistent and recurring theme.

Ishmael successfully obtained possession of the property by court order from the White County Circuit Court around Thanksgiving of 2017, over a year after the debtor filed her bankruptcy. The Trustee indicated that he finally resolved the title issues on this piece of property in late 2017 or 2018. He indicated that he addressed the title issues in the adversary proceeding filed by Ishmael by filing an avoidance counterclaim. He ultimately resolved the adversary proceeding by relinquishing the estate's interest for an unspecified amount.

Accordingly, and in sum, the debtor had an absolute belief that she owned the property through her husband's various IRS and Eichler family-related transactions and had consistently held that interest since 2002, reaffirmed in 2012. She duly noted pending litigation to divest her of that interest. The Trustee participated in the litigation and obtained an unspecified benefit for the estate. That resolution postdated her petition and representations on her schedules consistent with her belief in ownership. The debtor's listing of this property does not suffice to support a denial of discharge.

### 3. Other Properties

While the Trustee's Complaint referenced only SPI and 114 Belinda Lane, the Trustee introduced evidence concerning other pieces of property at trial, specifically 112 Belinda Lane, collectibles of value, Ole South, clothes and jewelry, a John Deere tractor, cows, and household goods and furnishings. Neither individually nor collectively did this evidence demonstrate sufficient grounds for a denial of discharge.

In the first instance, the debtor scheduled each piece of property with the predicate that she was going through a messy divorce and did not have access to all of her property. Second, few if any infirmities exist with respect to each examined item. The Trustee did not point to any particular misrepresentation concerning 112 Belinda Lane, and the court finds none. The debtor gave a reasonable explanation for her high valuation of the Ole South inventory, testifying that she had not really seen any of the remaining inventory since 2014 when the Eichler family began to divest her of any perceived interests. The Trustee introduced no evidence concerning conflicting or inappropriate entries with respect to her clothes, jewelry, cows, or the John Deere tractor. The only inconsistency was a $250,000 entry in her original schedules for household goods and furnishings located at 112 Belinda Lane where she had been denied access by Randy Eichler. She quickly dropped the $250,000 valuation in a November 2016 amendment to her initial schedules.

Quite simply, the debtor did not make any false oaths or accounts on her schedules. She did not withhold information necessary for the Trustee to determine her financial affairs. She listed items she felt she had an interest in, only to be divested postpetition through standard examination and litigation. She had nothing to gain by listing assets she did not believe were hers; she knew each item was already in dispute either in her divorce or through claims made or civil proceedings initiated. A failure to prevail does not vitiate an obligation to disclose.

28

B.  11 U.S.C. § 727(a)(3)

The Trustee also seeks to deny the debtor's discharge pursuant to 11 U.S.C. § 727(a)(3), which provides as follows:

(a)  The court shall grant the debtor a discharge, unless—
(3)  the debtor has concealed, destroyed, mutilated, falsified, or failed to keep or preserve any recorded information, including books, documents, records, and papers, from which the debtor's financial condition or business transactions might be ascertained, unless such act or failure to act was justified under all of the circumstances of the case[.]

11 U.S.C. § 727(a)(3) (2019). "Under this statute, the debtor has an affirmative duty to create records accurately documenting h[er] financial affairs." *Cooper*, 399 B.R. at 644 (citing *Peterson v. Scott* (*In re Scott*), 172 F.3d 959, 969 (7th Cir. 1999)).  "[T]he burden is on the objecting party to show that the debtor has failed to keep or preserve sufficient and/or accurate records which would reflect the recent financial condition of the debtor." *Anderson v. Wiess* (*In re Wiess*), 132 B.R. 588, 592 (Bankr. E.D. Ark. 1991) (citing FED. R. BANKR. P. 4005).  "Once [the objecting party] has made a *prima facie* case [of deficient record keeping], the burden shifts to the debtor to justify why the particular record was not maintained." *Davis v. Wolfe* (*In re Wolfe*), 232 B.R. 741, 745 (B.A.P. 8th Cir. 1999) (citing *Weiss*, 132 B.R. at 592).

Section 727 "does not contain an intent element as part of its proof."  *First State Bank of Newport v. Beshears* (*In re Beshears*), 196 B.R. 468, 474 (Bankr. E.D. Ark. 1996).  Thus, "[t]he standard is one of reasonableness." *Id.*  (citation omitted).  Specifically, the court's analysis "in determining whether [the debtor's] discharge should be denied under section 727(a)(3)" focuses on the following:  the "debtor's education, the sophistication of the debtor, [the] debtor's business experience, the size and complexity of debtor's business, [the] debtor's personal financial structure, and any special circumstances that may exist." *Id.*  (citation omitted).  "The trustees and creditors must receive enough information 'to enable them to trace the debtor's financial history;

to ascertain the debtor's financial condition; and to reconstruct the debtor's financial transactions.'" *Snyder v. Dykes* (*In re Dykes*), 590 B.R. 904, 910 (B.A.P. 8th Cir. 2018) (citation omitted).

In both the Complaint and at trial, the Trustee did not necessarily suggest or argue that the debtor had concealed, destroyed, or mutilated documents or had failed to keep sufficient records. The Complaint is not specific in this regard, and the Trustee did not produce sufficient evidence to meet his burden under this section. For these reasons and for those set forth in the section above, the Trustee's requested relief under this section is denied.

## C.  11 U.S.C. § 727(a)(5)

The Trustee's third cause of action also fails. Pursuant to 11 U.S.C. § 727(a)(5), a debtor's discharge can be denied for failure "to explain satisfactorily, before determination of denial of discharge under this paragraph, any loss of assets or deficiency of assets to meet the debtor's liabilities." 11 U.S.C. § 727(a)(5) (2019). "The party objecting to [the] debtor's discharge pursuant to section 727(a)(5) has the burden of proving facts establishing that a loss or shrinkage of assets actually occurred." *Sendecky*, 283 B.R. at 765.

> If [the Trustee] demonstrates a deficiency of assets, the burden shifts to the debtor to explain the loss.  If the explanation is too vague, indefinite, or unsatisfactory then the debtor is not entitled to a discharge. The explanation given by the debtor must be definite enough to convince the trial judge that assets are not missing.

*Id.* at 766 (citations omitted).

Again, in the Complaint and at trial, the Trustee did not necessarily point out, argue, or produce evidence that the debtor could not explain any loss or deficiency of assets. As outlined above, the debtor believed she owned assets and listed them accordingly. She noted her pending divorce and gave notice to the Eichler family members who were seeking to divest her of those

interests.  She lost, but she disclosed what she believed.  The Trustee did not meet his burden of proof under this section.

### IV.  Conclusion

For the reasons stated herein, the relief requested by the Trustee in his Complaint is denied. A separate judgment will be entered to this effect.

IT IS SO ORDERED.

Dated this 3rd day of May, 2019.

_____
HONORABLE RICHARD D. TAYLOR
UNITED STATES BANKRUPTCY JUDGE

cc:    Reba Eichler
       John G. Phillips
       J. Brad Moore
       Frederick S. Wetzel, III